No. 24-2858

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DOUGLAS CAMPBELL THOMSON, JOHN ANTHONY HELLIWELL and
ROBERT LAYNE SIEBENBERG,

*Plaintiffs-Appellants,*

v.

CHARLES ROGER POMFRET HODGSON A/K/A ROGER HODGSON,
RICHARD DAVIES, and DELICATE MUSIC,

*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
CASE NO. 2:21-CV-08124-AB-MRW

---

### APPELLANTS' OPENING BRIEF

---

MANDAVIA EPHRAIM & BURG LLP

DAVID L. BURG
ANJANI MANDAVIA
1801 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 556-9694 Telephone
(310) 492-9868 Facsimile

Attorneys for *Plaintiffs/Appellants Douglas Campbell Thomson,
John Anthony Helliwell, and Robert Layne Siebenberg*

Date: August 23, 2024

1

# <u>TABLES OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................... 3

INTRODUCTION ....................................................................... 5

JURISDICTIONAL STATEMENT ................................................ 8

ISSUES PRESENTED.................................................................. 8

STATEMENT OF THE CASE........................................................ 9

      A.    RELEVANT FACTUAL BACKGROUND ................................ 9

      B.    RELEVANT PROCEDURAL BACKGROUND........................ 21

STANDARD OF REVIEW ...........................................................27

SUMMARY OF ARGUMENT .......................................................28

ARGUMENT .............................................................................29

      A.    INTRODUCTION.................................................... 29

      B.    THE NATURE OF THE 1977 AGREEMENT
            ESTABLISHES THAT IT WAS NOT SUBJECT TO
            TERMINATION BY DEFENDANTS ........................................ 31

      C.    THE PARTIES' LONGSTANDING COURSE OF
            CONDUCT ESTABLISHES THAT THEY INTENDED
            THEIR ROYALTY SHARING ARRANGEMENT UNDER
            THE 1977 AGREEMENT TO CONTINUE FOR AS LONG
            AS PUBLISHING REVENUE DERIVED FROM THE
            SONGS SUBJECT TO THAT AGREEMENT CONTINUES
            TO EXIST ........................................................... 37

      D.    CONCLUSION ...................................................... 45

CERTIFICATE OF COMPLIANCE..................................................46

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

### Federal

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*,
   618 F.3d 1066 (9th Cir. 2010) ....................................................................... 27-28

*United Commercial Ins. Service, Inc. v. Paymaster Corp.*,
   962 F.2d 853 (9th Cir. 1992) ..........................................................................27, 28

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*,
   178 F.Supp. 655 (S.D.N.Y. 1959),
   *aff'd.* 280 F.2d 197 (2d Cir. 1960)..............................................34, 35, 38, 42, 44

### State

*Brown v. Goldstein*,
   34 Cal.App.5th 41 (2019) .............................................................................. 38-39

*City of Hope National Medical Center v. Genentech, Inc.*,
   43 Cal.4th 375 (2008) ...........................................................................................30

*Consolidated Theatres, Inc. v. Theatrical Stage Employees Union*,
   69 Cal.2d 713 (1968) ........................................................................ 31-32, 33, 34

*Crestview Cemetery Association v. Dieden*,
   54 Cal.2d 744 (1960) .............................................................................................38

*Filtzer v. Ernst*,
   79 Cal.App.5th 579 (2022) ....................................................................................28

*Gilkyson v. Disney Enterprises, Inc.*,
   66 Cal.App.5th 900 (2021) ...............................................................................7, 38

*Haggerty v. Warner*,
   115 Cal.App.2d 468 (1953) .............................................................................33, 34

*Lura v. Multaplex*,
129 Cal.App.3d 410 (1982) ...................................................................7, 35, 36

*Reigelsperger v. Siller*,
40 Cal.4th 574 (2007) ...........................................................................30

*RMR Equipment Rental v. Residential Fund 1347, LLC*,
65 Cal.App.5th 383 (2021) ................................................................ 29-30

*Securitas Security Services USA, Inc. v. Superior Court*,
234 Cal.App.4th 1109 (2015) .................................................................30

*Wolf v. Walt Disney Pictures & Television,*
162 Cal.App.4th 1107 (2008) .............................................................7, 27, 28

## <u>INTRODUCTION</u>

Plaintiffs Douglas Thomson, John Helliwell, and Robert Siebenberg, and defendants Roger Hodgson and Rick Davies, were the five members of the rock band *Supertramp*, a critically acclaimed and commercially successful musical group that was at the height of its popularity from the mid-1970s into the early 1980s. Defendant Delicate Music is a partnership of Roger Hodgson and Rick Davies, the original principal songwriters of the group.[1]

In 1977, the five members of *Supertramp* and their manager entered into a written agreement that, on a prospective basis, allocated music publishing royalties generated from the band's songs among its members. They further agreed that these publishing royalties would be collected, administered, and distributed by Delicate Music in accordance with the band members' contractually allocated percentages.

The parties operated under this royalty-sharing agreement, as subsequently orally amended, for over 40 years. Suddenly, in 2018, Roger Hodgson, Rick Davies, and Delicate Music ceased accounting to and paying their longtime former bandmates their longstanding contractual share of these publishing royalties.

Plaintiffs subsequently sued Defendants for breach of contract. The matter ultimately proceeded to a jury trial during which the District Court ruled, as a matter

---

[1] For clarity, Appellants – plaintiffs below – are referred to as "Plaintiffs" throughout this brief, and Appellees – defendants below – are referred to as "Defendants."

5

of law, that Defendants were legally entitled to unilaterally terminate the parties'
written 1977 royalty-sharing agreement after a "reasonable time." The District
Court reached this erroneous conclusion because the 1977 agreement did not
contain an express term of duration, and because the Court found – incorrectly in
our view – that the duration of Defendants' obligation to share publishing royalties
could not be implied from the nature of the agreement or the circumstances under
which it was made.

Then, compounding its legal error, the District Court submitted to the jury the
sole question of whether the 41 years that had passed from 1977 to 2018 constituted
such a "reasonable time." Not surprisingly, the jury found that it was, thereby
ratifying Defendants' unilateral cessation of royalty payments to Plaintiffs under the
parties' written royalty sharing agreement. Accordingly, under the District Court's
erroneous interpretation of the agreement, there was no breach and judgment was
entered against Plaintiffs.

The District Court's ruling that the parties' 1977 royalty-sharing agreement
could be terminated after a "reasonable time" was inconsistent with blackletter
California law, which requires Defendants to honor their agreement with Plaintiffs
so long as the publishing revenue that is the subject of that agreement continues to
flow. Indeed, governing California law required the District Court to rule – as a
matter of law – that *this* was the implied duration of the parties' royalty-sharing

6

agreement. *See, e.g.*, *Lura v. Multiplex*, 129 Cal.App.3d 410, 414-15 (1982) ("where an obligation is conditioned upon an event connected with the subject matter of the contract, the obligation continues until that event occurs"). The parties' longstanding course of conduct in continuing their performance of this agreement over four decades also strongly supports this interpretation. *See Gilkyson v. Disney Enterprises, Inc.,* 66 Cal.App.5th 900, 920 (2021) (pre-dispute conduct constitutes strong evidence of the parties' intent and understanding of the contract).

The extrinsic evidence admitted at trial did not conflict in any way relevant to the District Court's determination of these contractual issues. Accordingly, this Court now must interpret that agreement *de novo*. *Wolf v. Walt Disney Pictures & Television,* 162 Cal.App.4th 1107, 1135 (2008). In so doing, we believe this Court must hold – consistent with governing California law – that Defendants had (and have) a continuing obligation under the parties' 1977 agreement to pay Plaintiffs their contractual share of publishing royalties for as long as the *Supertramp* songs that were governed by that agreement continue to generate revenue.

When Defendants unilaterally ceased paying Plaintiffs their contractual allocation of royalties, they breached the parties' long-honored agreement. Consequently, this Court should reverse the judgment below, and remand the matter to the District Court with instructions to enter judgment in favor of Plaintiffs on the issue of Defendants' liability for breach of contract, and to proceed to a

7

determination of the amount of damages suffered by Plaintiffs as a result of Defendants' contractual breach.

## JURISDICTIONAL STATEMENT

This appeal is from a Final Judgment on Jury Verdict entered on April 2, 2024 by the District Court for the Central District of California. Plaintiffs timely filed their Notice of Appeal on May 1, 2024.

The District Court had subject matter jurisdiction of the underlying matter pursuant to 28 U.S.C. §1331 based on Defendants' affirmative defenses asserted pursuant to the Copyright Act (17 U.S.C. §101 *et seq.*). This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291 and Fed. Rule App. Proc. 4(a)(1)(A).

## ISSUES PRESENTED

1. Whether the District Court erred in failing to rule, as a matter of law, that the implied duration of the parties' royalty sharing agreement was for as long as the royalties that were the subject of the agreement continued to be generated.

2. Whether the District Court erred in ruling, as a matter of law, that the parties' royalty sharing agreement contained no implied term of duration, and therefore could be unilaterally terminated by Defendants after a "reasonable time."

3. Whether the District Court erred in submitting to the jury the question of whether Defendants' unilateral termination of the parties' royalty sharing agreement occurred after a "reasonable time."

## STATEMENT OF THE CASE

### A. Relevant Factual Background

In 1973, plaintiffs Douglas Thomson (Thomson"), John Helliwell
("Helliwell"), and Robert Siebenberg ("Siebenberg") ("Plaintiffs"), and defendants
Roger Hodgson ("Hodgson") and Rick Davies ("Davies"), were the five members
of the rock band *Supertramp*. (4-ER-607; 9-ER-1509.)

Between 1973 and 1977, the band recorded, released, and toured to support
three record albums, all of which were extremely successful. (4-ER-607; 9-ER-
1510.)[2] Hodgson and Davis were the principal songwriters and composed all
songs on the band's first six albums. (3-ER-405; 7-ER-1216:12-19; 5-ER-827:6-
15.)

The sale and public performance of the band's records generated two
potential streams of revenue for the band members: (1) revenues derived from
exploitation of the copyrighted sound recordings embodying the band's musical
performances, in which all band members shared equally ("recording royalties");
and (2) revenues derived from exploitation of the underlying copyrighted musical
compositions (songs) embodied in these sound recordings which, by default, were
shared only by the two songwriters and the music publisher ("publishing royalties"

---

[2] These albums were *Crime of the Century*, released in September 1974; *Crisis?
What Crisis?,* released in November 1975; and *Even in the Quietest Moments*,
released in April 1977. (4-ER-607; 9-ER-1510.)

9

or "songwriting royalties").[3]  (5-ER-741:9-14; 5-ER-776:8-18; 5-ER-777:5-8; 7-ER-1218:24-1219:2; 8-ER-1411:25-1412:3.)

At some time prior to 1977, the Plaintiff band members expressed to Defendants their strong concern that, although the band had to that point released two best-selling albums – supported by two grueling but highly successful tours – and the members then were all hard at work on their third album, Plaintiffs were receiving no money for their efforts because all recording royalties and tour revenues were used to reimburse the band's record company for the costs advanced to produce and distribute the albums, and to launch and support the tours.  (5-ER-672:2-673:13; 7-ER-1211:22-1212:12; 7-ER-1213:3-7; 7-ER-1215:19-1215:1; 5-ER-690:7-9.)  Thus, the only unencumbered revenue then being generated by the band – *i.e.*, revenue not subject to the record company's recoupment priority – were the publishing royalties then being paid solely to Hodgson and Davies.  (5-ER-741:18-20; 5-ER-789:19-25; 6-ER-931:13-932:1.)

---

[3] "Publishing royalties" or "publishing income" is often used as an umbrella term to reference both the publisher's share and the writer's share of royalties. Hodgson and Davies formed defendant Delicate Music ("Delicate") as a sub-publishing company to own and administer their portion of the publishing royalties derived from their songs, thereby retaining a larger share for themselves (7-ER-1225:7-22); unlike with an outside publishing company, through Delicate they could retain 50% of the publisher's share, as well as 100% of the writers' share, of the publishing royalties, to be split between the two of them. (*See* 3-ER-206; 5-ER-809:18-22.)

Plaintiffs expressed to Defendants their understandable view that Plaintiffs' performances in recording these *Supertramp* albums, and then touring throughout the world to support them, substantially contributed to the commercial success of the band's songs, and therefore it was appropriate for Plaintiffs to share in some measure in their resulting publishing royalties. (5-ER-690:23-691:15; 5-ER-693:7-17.) In response, Hodgson and Davies agreed to share these publishing royalties with Plaintiffs because – as Hodgson testified – they wanted to keep the band well-functioning and happy (8-ER-1336:5-19), they wanted to continue working with Plaintiffs in light of their contributions to date (8-ER-1337:1-9), and they wanted to keep Plaintiffs touring with the band as this was an essential promotional and marketing tool to help keep their music successful and alive (8-ER-1340:8-19).[4]

Accordingly, the five band members, and their manager, David Margereson ("Margereson"), entered into a Memorandum of Agreement (Publishing), dated as of January 18, 1977, allocating the songwriting/publishing royalties generated from the exploitation of the *Supertramp* songs – which previously had been split 50/50 between Hodgson and Davies only – in specified allocations among the five band members and their manager ("1977 Agreement"). (3-ER-220-221; 4-ER-608; 9-ER-1511.) The 1977 Agreement contains the following key provisions:

---

[4] There is some disagreement among the parties regarding precisely when and where these various discussions occurred, and among which parties, but those disagreements do not bear on the issues in this appeal.

11

2.      The parties hereby agree that effective January 1, 1977, all song writing and publishing royalties (and/or other income) derived from the parties' songwriting and/or publishing activities shall be allocated in the following manner: …

(b)      On any compositions recorded by the performing group Supertramp the net writing and publishing income derived from said recordings (herein, the "shared publishing income"), without any management commission payable to David Margerson, shall be paid to each of the undersigned in the following proportions:

| | |
|---|---|
| Roger Hodgson | 27% |
| Richard Davies | 27% |
| Douglas Campbell Thomson | 11.5% |
| John Anthony Helliwell | 11.5% |
| Robert Layne Siebenberg | 11.5% |
| David Margerson | 11.5% |

3.      The copyrights of the compositions shall be owned by the respective writers who write the compositions and shall be administered by Delicate Music, a partnership consisting of Richard Davies and Roger Hodgson.

(3-ER-220-221.)

The proper interpretation of the 1977 Agreement is the core issue in this

Appeal.[5]

_____

[5] The parties entered into several other agreements dated as of January 18, 1977, including a recording contract between the band and A&M Records, Inc. ("A&M") (3-ER-160-183); a Songwriter's and Composer's Agreement between the band members and Almo Music Corp. ("Almo"), the music publishing arm of A&M, pursuant to which the band members agreed to render their songwriting services to Almo and transfer to Almo all their rights, including copyrights, to any such songs (3-ER-184-204); and a Participation Agreement between Delicate and Almo, pursuant to which Delicate and Almo agreed to jointly share ownership of the musical compositions written by Hodgson and/or Davies (3-ER-205-219).

Pursuant to the 1977 Agreement, Defendants immediately began paying Plaintiffs their specified shares of the *Supertramp* publishing royalties. (4-ER-609; 9-ER-1511.) Also pursuant to that Agreement, Delicate has been the entity through which Hodgson and Davies collected and distributed these royalties to Plaintiffs. (4-ER-608; 9-ER-1510.)[6]

Paul Glass ("Glass"), who served as business manager for both *Supertramp* and Delicate, was tasked with administering and distributing the allocated publishing royalties otherwise due to Hodgson and Davies, and ensuring that all band members received their respective contractual percentages. (7-ER-1113:3-5; 7-ER-1132:3-7.) Thus, from 1977 to 2018 – more than four decades – Plaintiffs regularly received from Glass, on approximately a quarterly basis, their share of the *Supertramp* publishing royalties along with an accounting. (5-ER-706:15-707:1.)

The band continued to record and tour following the 1977 Agreement. In 1979, *Supertramp* released its fourth album, *Breakfast in America*, which quickly became its biggest hit record, selling over 30 million copies worldwide. (8-

---

[6] Delicate regularly received songwriting royalty payments due to Hodgson and Davies as composers of the copyrighted works, and then calculated and paid out the allocations due to Plaintiffs and other participants. (6-ER-1079:22-1080:5.)

ER1337:15-19; 4-ER-608; 9-ER-1510-1511.)[7]  This success allowed the band to renegotiate its record contract and, in 1981, *Supertramp* landed the most lucrative record deal that A&M had made to date.  (5-ER-713:4-9; 5-ER-713:14-17; 8-ER:18-20.)

After the release of *Breakfast in America*, the band members finally began earning recording royalties (8-ER-1340:23-1341:2, 7-ER-1235:21-1236:1), and Hodgson and Davies became increasingly unhappy with the publishing revenue split to which they previously had agreed.  Thus, in 1982, the parties discussed amending their 1977 Agreement to increase Hodgson's and Davies' publishing royalty allocations for the band's upcoming sixth album, *Famous Last Words*, and also to give their sound engineer, Russel Pope ("Pope"), his own allocation of the publishing royalties from that upcoming record.  (3-ER-339; 5-ER-743:8-14; 7-ER-1238:16-23.)

Accordingly, in March 1983, the parties orally amended their 1977 Agreement to provide that Hodgson and Davies each would receive 32.15% of the publishing revenues, and Thomson, Helliwell, Siebenberg, Margereson, and Pope each would receive 7.14% of the publishing revenues from exploitation of the

---

[7] The band's fifth album, *Paris* (released in 1980), was a live album recorded on their *Breakfast in America* tour in Paris, France.  (4-ER-607-608; 9-ER-1510.)

songs on *Famous Last Words*. 3-ER-365 & 375. The revenue splits for the earlier albums remained the same. (5-ER-743:3-744:1.)

Hodgson, Margereson, and Pope all left *Supertramp* in 1983. (4-ER-608; 9-ER-1511; 3-ER-340-341; 3-ER-424-425.) To facilitate Margereson's withdrawal, he and his management company, Mismanagement, Inc. ("Mismanagement"), entered into a written agreement with the band members and their various affiliated entities dated as of October 1, 1983, setting forth, among other things, the band's "continuing obligation" to share certain of its revenues and assets with Mismanagement. (3-ER-341.) With respect to publishing royalties generated from the band's existing recordings (defined in the agreement as "Commissionable Publishing Income"), the parties agreed that Mismanagement would be entitled to receive from Delicate "in perpetuity" 1/14 (*i.e.* 7.14%) of all Commissionable Publishing Income derived from songs on *Famous Last Words*, and 11.5% of all Commissionable Publishing Income derived from the band's other songs – that is, the same percentages that were due to Margerson under the 1977 Agreement as amended. (3-ER-344-345.)

Pope and his production company entered into a similar agreement with the band members and their affiliated entities, dated as of December 12, 1984, which included Pope's right to "continue to receive from Delicate, in perpetuity" 7.14%

15

of the income derived from songs on *Famous Last Words* as per the 1977 Agreement as amended.  (3-ER-340.)

Hodgson's withdrawal agreement is dated as of December 13, 1984, and it, likewise, contains detailed provisions regarding Hodgson's continuing rights and interests in the *Supertramp* recordings and other assets ("1984 Agreement").  (3-ER-364-412.)  The 1984 Agreement was intended to address all business issues between Hodgson and the band.  (7-ER-1244:10-1244:5.)  It took a full year to negotiate, during which Hodgson was represented by separate counsel and a new business manager.  (5-ER-748:3-15.)

With respect to music publishing revenue, the 1984 Agreement expressly stated right up front, in Recital G, that this revenue is allocated among the five band members, Mismanagement, and Pope in accordance with the 1977 Agreement as amended.  (3-ER-365.)  Paragraph 7.1 of the 1984 Agreement then states that Hodgson would continue to receive the publishing royalties allocated to him under the 1977 Agreement:

> Hodgson shall continue to receive from Delicate, in perpetuity: (a) twenty-seven percent (27%) of the Net Music Publishing Income received by Delicate from the exploitation of all musical compositions embodied on all Supertramp long-playing record albums released prior to the release of the album entitled "Famous Last Words" ("Pre-FLW Composition") and (b) thirty-two and fifteen hundredths percent (32.15%) of the Net Music Publishing Income received by Delicate from the exploitation of all musical compositions embodied on the Supertramp record album entitled "Famous Last Words" ("FLW Compositions"). Pre-FLW Compositions and FLW Compositions are

16

hereinafter sometimes collectively referred to as "Delicate Compositions."

(3-ER-375-376.)

Paragraph 7.5 of the 1984 Agreement requires Hodgson to pay over to Delicate – for its use in calculating and distributing the music publishing revenue allocated to the other parties by the 1977 Agreement as amended – all publishing revenue paid directly to Hodgson for exploitation of the "Delicate Compositions," *i.e.,* the songs subject to the 1977 Agreement:

> Immediately upon receipt by Hodgson or his representatives of any monies representing the writer's share of public performance income derived from exploitation of the Delicate Compositions, whether such income is received from a public performance society such as ASCAP or from any other source except Delicate, Hodgson shall pay over to Delicate and shall endorse any and all checks and drafts necessary to effect such payment over to Delicate any and all such monies. Upon receipt by Delicate, all such monies shall be included in the calculation of Delicate's Net Music Publishing Income from the exploitation of the Delicate Compositions.[8]

(3-ER-375-376.) Paragraph 7.6(a) provides a mechanism for Hodgson and Davies to maintain an equal royalty split between them in the event that either thereafter purchased another person's interest in the publishing royalties derived from their

---

[8] ASCAP is the acronym for the American Society of Composers, Authors and Publishers, an organization that collects and distributes performance royalties to songwriters who are members. (6-ER-1040:15-20.)

17

*Supertramp* songs.[9]  And Davies and Hodgson were required to maintain Delicate in business until the expiration of all copyrights (including renewal terms) owned in whole or in part by that company.  (3-ER-377-378.)

Following Hodgson's departure from *Supertramp*, the band continued to record and tour with its remaining members.  (5-ER-750:8-11.)

In 1988, Hodgson, with the consent of Davies, sent a letter of direction ("Letter of Direction") to ASCAP instructing it to change the allocation of the writers' shares of the *Supertramp* songs from 50% to Hodgson and 50% to Davies, to 32.15% to Hodgson and 67.85% to Davies for the songs on *Famous Last Words*, and 27% to Hodgson and 73% to Davies for the songs on *Supertramp's* other albums.  (3-ER-444-446.)  The purpose of the Letter of Direction was to allow Hodgson to receive his contractual share of the writer's royalties directly, without having them go through Delicate, so Delicate would pay from Davies' increased

---

[9] "[I]f either Davies' or Hodgson's twenty-seven percent (27%) share of Delicate's Net Music Publishing Income from the exploitation of Pre-FLW Compositions, and/or if Davies' or Hodgson's thirty-two and fifteen hundredths percent (32.15%) share of Delicate's Net Music Publishing Income from the exploitation of FLW Compositions, increases for any reason (other than by gift, bequest, inheritance operation of law, or court decree) at any time after the date hereof (e.g., by reason of such party's purchase of all or a portion of another person's interest in such income), whichever of Davies or Hodgson whose share of such income did not so increase shall have the right to acquire from the other of them fifty percent (50%) of the amount by which such other party's share of such income increased over the share owned by such other party immediately prior to the increase." (3-ER-378-379.)

18

allocation the allocations due to Plaintiffs and the other participants under the 1977 Agreement as amended.  (7-ER-1135:6-20; 7-ER-1248:18-1249:4; 8-ER-1371:14-25.)

In 1991, Plaintiffs, Davies, and the band's new manager and her company entered into a letter agreement drafted by Glass (the band's business manager) addressing, among other things, their respective music publishing royalty allocations derived both from the band's post-*Famous Last Words* songs (none of which were written by Hodgson) and from the songs on *Supertramp*'s far more successful earlier albums ("1991 Agreement").  (7-ER-1135:21-25.)  The 1991 Agreement provided that – after accounting for direct payments to Hodgson, Margereson, and Pope – the publishing royalty allocations payable to each party to the 1991 Agreement (including Plaintiffs) would remain the same "in perpetuity" as their contractual allocations under the 1977 Agreement as amended.  (3-ER-414-415.)

The first clause of the 1991 Agreement recites that "Delicate Music and Silver Cab Music [Davies' separate publishing company] hereby formalize an agreement with John, Dougie and Bob [*i.e.*, Plaintiffs] for an income participation in perpetuity" in the *Supertramp* songs through *Famous Last Words*, followed by mathematical proof that the various percentages were calculated to equal the allocations in the 1977 Agreement as amended.  (3-ER-414.)

19

Glass testified that he used the term "in perpetuity" in the 1991 Agreement because there was nothing in the 1977 Agreement stating otherwise, and because "these agreements are generally in perpetuity." (7-ER-1139:7-17.) Plaintiffs' expert, Jeffrey Jampol, a successful artist manager (6-ER-964:4-9), testified that sharing songwriting royalties with non-songwriters within a band has long been commonplace (6-ER-967:24-968:5), and that the primary reason for doing so is to keep the other band members happy and thereby ensure their continued performances in the studio and on tour (6-ER-971:2-13).

In 2016, Davies and Hodgson served statutory notices to Delicate and Universal Music Publishing Group ("UMPG"), the successor of A&M and Almo (6-ER-1045:2-7), terminating their assignments of the copyrights in the songs on the albums *Breakfast in America* and *Famous Last Words*, effective in 2018. (4-ER-609; 9-ER-1511-1512.)

From 1977 to 2018, Defendants dutifully paid Plaintiffs their contractual allocations of the *Supertramp* publishing royalties as required by the 1977 Agreement as amended. However, aside from a single one-time payment in 2021 (*see* 3-ER-447), Hodgson ceased paying Plaintiffs their contractual shares of the *Supertramp* publishing revenue in 2018 (8-ER-1307:8-10), and Davies stopped in or around that same time. Although Hodgson testified that he always understood the 1977 Agreement to be temporary and subject to termination (8-ER-1381:1-17),

20

he offered no evidence of having contemporaneously communicated this claimed understanding to Plaintiffs when they entered into the Agreement – or, indeed, at any time before Hodgson and Delicate terminated the royalty payments. (*See* 8-ER-1340:23-1341:7.)

## B. <u>Relevant Procedural Background</u>

This case originally was filed on July 7, 2021, in the Los Angeles County Superior Court. Davies removed the action to the District Court based on his affirmative defenses under the Copyright Act, as well as his cross-complaint seeking a declaration that, pursuant to the Copyright Act, he had no further obligation to share publishing royalties with Plaintiffs after the August 2, 2018 effective date of his termination notices to Delicate and UMPG. (2-ER-154-158; 2-ER-148-153.) Plaintiffs have settled with Davies, and the parties dismissed their respective complaint and cross-complaint against each other on April 19, 2023. (2-ER-80-81.) Thus, the remaining Defendants are Hodgson and Delicate.

Plaintiffs' First Amended Complaint is operative here. The FAC asserts a number of claims against Hodgson and Delicate, including for declaratory relief and breach of contract with respect to the 1977 Agreement, the 1984 Agreement, and the 1991 Agreement. (2-ER-142 & 145-146.)

Hodgson's Amended Answer to the FAC denies Plaintiffs' claims, and asserts affirmative defenses based on, *inter alia*, preemption by the Copyright Act

(Sixteenth and Twenty-Seventh Affirmative Defenses) (2-ER-142 & 145-146), lack of consideration and/or failure of consideration as to the 1977, 1984, and 1991 Agreements (Second and Third Affirmative Defenses), and unclean hands (Nineteenth Affirmative Defense). (2-ER-130-133.)

Delicate's Answer to the FAC similarly denies Plaintiffs' claims, and asserts affirmative defenses based on, *inter alia*, preemption by the Copyright Act (Eleventh, Twelfth and Twenty-Second Affirmative Defenses), and unclean hands (Fifteenth Affirmative Defense). (2-ER-118-119.)

On March 17, 2023, Plaintiffs moved for summary adjudication of, among other things, Hodgson's Sixteenth and Twenty-Seventh Affirmative Defenses, and Delicate's Eleventh, Twelfth and Twenty-Second Affirmative Defenses (*i.e.*, the copyright termination defenses) ("MSA"). (2-ER-82-107.) Plaintiffs also sought summary adjudication of their claims for breach of contract for Defendants' failure to pay Plaintiffs' contractual shares of royalties under the 1977 Agreement, the 1984 Agreement, and the 1991 Agreement (collectively defined therein as the "Participation Agreement"), and for a declaratory judgment that Plaintiffs are contractually entitled to continuing royalty payments under the Participation Agreement. *Id.*

Defendants filed their Opposition to the MSA on April 21, 2023 (2-ER-55-79); and Plaintiffs filed their Reply on May 5, 2023 (2-ER-37-54).

Defendants argued in their opposition to the MSA that Plaintiffs' alleged unclean hands and the purported failure of consideration for the Participation Agreement precluded summary adjudication for Plaintiffs on their breach of contract and declaratory relief claims (2-ER-77-79). On this basis, Plaintiffs contended – and the District Court agreed – that the MSA also implicated Hodgson's Second and Third Affirmative Defenses for lack of consideration, and Hodgson's Nineteenth Affirmative Defense and Delicate's Fifteenth Affirmative Defense of unclean hands. (3-ER-44-46; 1-ER-15, fn. 5.)

On August 25, 2023 the District Court issued its order granting the MSA in part and denying it in part. (1-ER-9-23.)

The District Court began by noting that Defendants had all but abandoned their copyright termination defenses, having conceded that their termination notices were not directed to the 1977 Agreement, the 1984 Agreement, or the 1991 Agreement: "The Court accepts this representation to mean that, at least in this case, Defendants do not—and will not—argue that any royalty obligation owed to Plaintiffs under the Participation Agreement is terminable (or was terminated) under the Copyright Act." (1-ER-16.) Accordingly, the Court denied as moot Plaintiffs' request for summary adjudication of Defendants' copyright termination defenses. (1-ER-17.)

23

The District Court also denied Plaintiffs' request for summary adjudication of their own breach of contract and declaratory relief claims (1-ER-20). However, the Court nonetheless granted summary adjudication to Plaintiffs on Defendants' affirmative defenses of unclean hands and lack of consideration. (1-ER-20-23.)[10] With respect to claimed lack of consideration the Court ruled:

> Here, the consideration Defendants received from Plaintiffs was straightforward: The 1977 Agreement was "needed to keep Plaintiffs [] working with and for the band." And Plaintiffs continued working with and for the band through Hodgson's exit in 1984, and for decades beyond: "Supertramp continued to release albums and tour live for much of the 1980s" and "toured again in 2010 and 2011 and performed what would turn out to be their last concerts." In other words, Defendants accepted and received the benefit awarded to it by the contract. Only after Defendants terminated the contract in 2018— a termination they claim justified because "Hodgson had a right under California law to terminate at will"—did they then represent that the consideration they enjoyed over many decades was never valid in the first instance. … If Defendants felt that their contractual obligation never existed in the first place due to "illusory consideration" they needed to raise that argument many decades ago. Instead, they continued to accept its tangible, financial benefits.

(1-ER-14-15 (record cites omitted)).

The District Court then sought to boil the parties' dispute down to its essence: "Examined through a focused lens, this dispute presents a single issue: Is (or was) Defendants' obligation to pay Plaintiffs royalty interests (1) terminable at-will; or (2) conferred in perpetuity." (1-ER-18.)

---

[10] Defendants have not appealed this ruling.

On this basis, the case then proceeded to a jury trial on February 20, 2024, which continued for six days. (1-ER-5.) Defendants made a motion for judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure after Plaintiffs rested (7-ER-1181:10-1182:18), and Plaintiffs made a Rule 50 motion for judgment after Defendants rested (8-ER-1412:24-25; 2-ER-27-37).

In ruling on these cross-Rule 50 motions, the District Court ruled that, as a matter of law, the 1984 Agreement contained no affirmative obligation on the part of Hodgson to distribute any publishing revenue to Plaintiffs, and that Delicate's stated obligation in the 1984 Agreement to distribute funds "in perpetuity" applied only to its obligation to pay Hodgson, not Plaintiffs. The Court also ruled that Delicate was not a party to the 1991 Agreement, nor was there any claim that Hodgson was personally bound by the 1991 Agreement. Accordingly, the Court granted Defendants' Rule 50 motion as to Plaintiffs' claims arising from the 1984 and 1991 Agreements. (1-ER-5 & 6-8.)

The District Court denied Defendants' Rule 50 motion with respect to the 1977 Agreement. (1-ER-5 & 6-7.) However, the Court also stated with respect to the 1977 Agreement:

> I have made the judicial determination that the contract contains no
> express duration nor has sufficient evidence been presented that there
> can be an implied duration based on the surrounding circumstances,
> including execution of or the nature of the '77 agreement specifically.
> Therefore, the only question that remains in the Court's view, and that
> will be presented to this jury, is whether to determine whether either

25

Hodgson or Delicate Music terminated the contract at will, after a reasonable time.

(1-ER-6-7.)  The District Court denied Plaintiffs' Rule 50 motion in its entirety.

(1-ER-5 & 8.)

Plaintiffs are not appealing the District Court's rulings with respect to the 1984 and 1991 Agreements (despite our disagreement with them).  However, Plaintiffs are appealing the District Court's rulings with respect to the 1977 Agreement as legally erroneous and requiring reversal by this Court.

The District Court then instructed the jury that the parties entered into a contract to share a portion of Hodgson's songwriting royalties through the 1977 Agreement (9-ER-1512:22-24; 9-ER-1513:9-12), but that, "[b]ecause neither the express language of the contract nor the nature of the contract and the surrounding circumstances provide a basis for implying a termination date for the contract, the contract may be terminated at will, upon notice, by any party after a reasonable time has elapsed.  It is up to you to decide whether the contract was terminated after a reasonable time."  (9-ER-1513:23-1514:4.)

The jury was presented with a special verdict form requiring it to answer yes or no to the following questions:

1. With respect to the 1977 Memorandum of Agreement (Publishing), did Defendant Hodgson terminate his contractual obligation to pay a portion of the songwriting royalties to Plaintiffs after a reasonable time?

26

2. With respect to the 1977 Memorandum of Agreement (Publishing), did Defendant Delicate Music terminate its contractual obligation to administer a portion of the songwriting royalties to Plaintiffs after a reasonable time?

(2-ER-25-26.)

The jury answered "yes" to both questions (*id.*), and Judgment on the jury verdict was entered against Plaintiffs and in favor of Defendants on April 2, 2024. (1-ER-2-4.) Plaintiffs' causes of action for open book accounting and declaratory relief were deemed moot and were dismissed. (1-ER-3.)

## STANDARD OF REVIEW

The District Court's interpretation of the 1977 Agreement is subject to *de novo* review.

The construction and enforcement of contracts by the federal courts is governed by principles of local law. *United Commercial Ins. Service, Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). It is well-settled in California that the interpretation of a written instrument is solely a judicial function when based on the words of the instrument alone or when there is no conflict in the extrinsic evidence, even when conflicting inferences may be drawn from the undisputed extrinsic evidence. *Wolf*, 162 Cal.App.4th at 1126-1127; *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1079 (9th Cir. 2010) (applying California law) (it is "solely a judicial function to

27

interpret a written instrument unless the interpretation turns upon the credibility of the extrinsic evidence").

California law also requires appellate courts to review contract interpretation issues *de novo*. *Filtzer v. Ernst,* 79 Cal.App.5th 579, 583 (2022) ("On appeal, we apply a *de novo* standard of review to interpret a contract. … This standard applies even where conflicting inferences may be drawn from undisputed extrinsic evidence…."); *United Commercial Ins. Service*, 962 F.2d at 856 ("Under California law, the interpretation of a contract is a question of law subject to *de novo* review.")  Indeed, appellate courts must decide issues of contract interpretation *de novo* even if the trial court erroneously submitted them to the jury. *Wolf,* 162 Cal.App.4th at 1134-35.

## SUMMARY OF ARGUMENT

The District Court erred in ruling, as a matter of law, that merely because the contract at issue was for an indeterminate period of time it could be unilaterally terminated by any party after a reasonable period.  Although the contract here does not contain an express term of duration, its very nature and purpose – a royalty sharing agreement – as well as the parties' continuing performance thereunder for decades before any dispute arose, establish as a matter of law that the contract had an implied duration lasting as long as the subject matter of the contract – *i.e.*, the *Supertramp* music publishing royalties – continued to be generated.  Defendants'

termination of the contract therefore constituted a breach. Accordingly, the judgment entered in Defendants' favor must be reversed, and the case must be remanded to the District Court for determination of Plaintiffs' contractual damages.

## ARGUMENT

### A. Introduction

The fundamental question in this appeal is whether the District Court properly concluded as a matter of law that it was impossible to determine how long the 1977 Agreement was intended to remain in force, and that its duration therefore was for a "reasonable time" only – after which any party unilaterally could terminate the agreement without liability.

It is settled law in California that a court's paramount goal in interpreting any contract is to enforce the intent of the contracting parties. If possible, this intent should be determined solely from the words of the contract. In the event of any ambiguity, the court may consider the nature of the agreement and the circumstances under which it was made to provide guidance as to the parties' intent. *See RMR Equipment Rental v. Residential Fund 1347, LLC*, 65 Cal.App.5th 383 (2021) ("Our mission in every contract case is to discern and effectuate the contracting parties' mutual intent. We begin with the words of the contract. The nature of the contract and the surrounding circumstances can inform those

words.").  The court also may look to a party's performance under the agreement prior to any dispute as evidence of that party's intent and understanding at the time it entered into the contract.  *City of Hope National Medical Center v. Genentech, Inc.*, 43 Cal.4th 375, 393-394 (2008).  It also is axiomatic under California law that, when assessing extrinsic evidence to construe a contract, "[t]he parties' expressed objective intent, not their unexpressed subjective intent, governs." *Securitas Security Services USA, Inc. v. Superior Court*, 234 Cal.App.4th 1109, 1125 (2015); *Reigelsperger v. Siller*, 40 Cal.4th 574, 579–80 (2007) (a party's "uncommunicated subjective intent is irrelevant.").

For purposes of this appeal, the critical language in the 1997 Agreement is as follows:

> "The parties hereby agree that effective January 1, 1977, all song writing and publishing royalties (and/or other income) derived from the parties' songwriting and/or publishing activities shall be allocated in the following manner: …."

(3-ER-220-221.)

Although the 1977 Agreement does not state that this royalty allocation would continue in perpetuity, it also does not limit the agreement's duration to a specified term nor does it state that the agreement continues only at the pleasure of Defendants.  Rather, the intended duration of the 1977 Agreement is manifested by its nature and purpose:  Defendants' obligation to share publishing revenue with Plaintiffs was and is, of course, dependent on publishing royalties being generated

from the *Supertramp* songs subject to the 1977 Agreement. If there were no such publishing revenues then there would be nothing to allocate. But the *Supertramp* songs have continued to generate publishing royalties over these many years – and they still do – and the parties' steadfast course of conduct over four decades, through a myriad of business and contractual relationships, has been to allocate these royalties in accordance with the 1977 Agreement.

As discussed below, the record regarding the nature of the 1977 Agreement and the parties' performance under that contract for over 40 years – all of which is undisputed – establishes as a matter of law that their agreement to share publishing revenue among the band members was intended to continue for as long as the songs subject to that Agreement continued to generate songwriting or publishing royalties. Defendants' sudden unilateral termination of the 1977 Agreement in 2018 therefore constituted a clear breach of contract resulting in substantial damage to Plaintiffs.

### B. <u>The Nature Of The 1977 Agreement Establishes That It Was Not Subject To Termination By Defendants.</u>

In *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union,* 69 Cal.2d 713 (1968) ("*Consolidated Theatres*"), the California Supreme Court was called on to determine whether a contract that provides for continuing performance, but contains no express term of duration, may nonetheless have an

implied term of duration tied to an event or condition that can be determined as a matter of law.

The contract at issue in that case was a labor agreement governing the employment of stagehands that had been made decades earlier, in 1931, when the plaintiff operator presented live stage performances at its theatres. Over the ensuing years those live stage theatres were converted to movie theaters. The question presented to the Supreme Court was whether the plaintiff's obligations under the 1931 agreement continued some 35 years later. 69 Cal.2d at 729-30.

After summarizing existing law the Supreme Court articulated the following rule of interpretation to be applied in determining the intent of the parties in such situations:

> In construing contracts which call for continuing performance or forbearance but which contain no Express term of duration, it is first necessary to determine whether the intention of the parties as to duration can be Implied from the nature of the contract and the circumstances surrounding it. Thus, in some cases the court by referring to the nature of the contract and the totality of circumstances is able to determine that the obligations of the contract were impliedly conditioned as to duration upon the occurrence or nonoccurrence of some event or situation.

69 Cal.2d at 725 (citations omitted).

The Supreme Court went on to hold: "the initial effort of the court … must *always* be that of implying a term of duration commensurate with the intentions of the parties." *Id.* (emphasis added). Only if "the nature of the contract and the

totality of surrounding circumstances give *no suggestion* as to any ascertainable term" does the "law impl[y] that the term of duration shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a reasonable time has elapsed." *Id.* at 727-28 (emphasis added).

Under the circumstances of the case before it, the Court concluded that, although the 1931 contract contained no express term of duration, it impliedly was conditioned as to duration "upon the continued possibility of live stage presentations at Consolidated's theatres"; that is, the contract subsisted as long as its intended subject matter existed. *Id.* at 730.[11]

In reaching its decision, the Supreme Court approvingly cited *Haggerty v. Warner*, 115 Cal.App.2d 468 (1953) – a case alleging facts quite similar to the facts here – for the proposition that "California courts have not hesitated to imply a term of duration" when reasonably possible: "[I]n *Haggerty v. Warner* it was held that a contract which provided that plaintiff was to receive 'Five Per Cent (5%) of all our billings' on certain units, but which contained no express term of duration,

---

[11] "[T]he disappearance of that possibility [*i.e.*, the possibility of live stage presentations] with the passage of time terminated all obligations under the contract." *Id.*

33

was subject to the construction that its obligations were to continue as long as 'billings' were made by defendants." 69 Cal.2d at 727 (citation omitted).[12]

The Supreme Court in *Consolidated Theatres* also cited *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655 (S.D.N.Y. 1959), *aff'd.* 280 F.2d 197 (2d Cir. 1960) ("*Warner-Lambert*"), for the proposition that the term of duration of a contract may be reasonably implied under certain circumstances. 69 Cal.2d at 727. The agreements at issue in *Warner-Lambert* contemplated royalty payments to the defendant's predecessor for use of the Listerine formula – which was a trade secret when the agreements were made. The plaintiff and its predecessors made the royalty payments for some 75 years, but then sought a declaratory judgment that the payments no longer were required because the Listerine formula no longer was a secret. *Id.* at 660-61. The plaintiff further argued that perpetual obligations are disfavored by law and that, because the royalty agreements were silent on the issue of duration, a "reasonable" termination date should be implied. *Id.*[13]

---

[12] In *Haggerty*, the trial court sustained defendant's demurrer to plaintiff's causes of action based on breach of the 5% commission agreement on several grounds, including that the agreement was uncertain for failing to include a time of duration. The Court of Appeal reversed that decision. 115 Cal.App.2d at 473-76.

[13] The original agreement at issue merely stated that the plaintiff's predecessor would "pay monthly to [the defendant's predecessor] his heirs, executors or assigns, the sum of twenty dollars for each and every gross of said Listerine hereafter sold by myself, my heirs, executors or assigns." *Id.* at 658.

The District Court rejected these arguments and granted summary judgment in favor of the defendant, holding that the plaintiff's obligation to pay the defendant was co-extensive with its manufacture or sale of Listerine: "On the face of the agreements the obligation of Lambert and its successors to pay is conditioned upon the continued manufacture or sale of Listerine. When they cease manufacturing or selling Listerine the condition for continued payment comes to an end and the obligation to pay terminates. This is the plain meaning of the language which the parties used." *Id.* at 662.

The District Court in *Warner-Lambert* further noted: "The obligation here is conditioned upon an event arising out of the very arrangement between the parties which is the subject matter of the contract." *Id.* "The mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties." *Id.* at 661.

The facts in *Lura v. Multaplex*, *supra*, are on all fours with the case at bar. The parties in *Lura* had entered into an agreement providing for the plaintiff to receive a 5% commission on the defendant's shipments to certain business accounts that had been procured by the plaintiff. The parties had neither discussed nor reached an understanding as to the duration of the agreement. Two and a half years later, the defendant notified the plaintiff of its intention to terminate the

35

commission payments on the ground that, by that time, full and reasonable compensation had been paid for the plaintiff's services.  129 Cal.App.3d at 412. The trial court accepted the defendant's arguments:

> At trial, respondent argued that since the agreement failed to provide for the term of commission payments to appellant, it should be interpreted to extend only for a reasonable time. Appellant argued that respondent was obligated to pay commissions as long as the specified accounts obtained by appellant were maintained. The trial court determined that the evidence presented failed to indicate that respondent's obligation should continue indefinitely or until respondent terminated shipments to the specified accounts. Thus, the obligation here could be terminated by either party upon notice after a reasonable time. The trial court then concluded that respondent's notice to appellant was sufficient and reasonable under the circumstances.

129 Cal.App.3d at 413.

The Court of Appeal, however, reversed the resulting judgment entered in favor of the defendant.  Analyzing and applying the reasoning in *Consolidated Theatres* and *Warner-Lambert*, the appellate court found that the defendant's contractual obligation to pay commissions to the plaintiff continued for as long as the defendant continued to make sales to the accounts at issue:  "The important factor, then, is not whether the contract fails to specify a termination date, but whether there is an ascertainable event which necessarily implies termination. … [W]here an obligation is conditioned upon an event connected with the subject matter of the contract, the obligation continues until that event occurs."  129 Cal.App.3d at 414-15.

The present case, like *Haggerty*, *Warner-Lambert*, and *Lura*, concerns Plaintiffs' entitlement to a percentage of a specific, well-identified revenue stream. As in those cases, the clear implication of the 1977 Agreement was that the parties would continue to allocate publishing royalties among themselves in accordance with the contractually stated percentages for as long as those royalties continue to be generated. Put differently, the only condition placed upon Defendants' contractual obligation to share publishing royalties (the subject matter of the contract) is the continued existence of these publishing royalties to share; accordingly, Defendants' allocation obligation continues until there are no more publishing royalties to share (*i.e.*, until the subject matter of the contract has been extinguished).

Thus, the nature of the 1977 Agreement itself establishes – as a matter of law – that the parties' obligations under that contract are ongoing as long as "song writing and publishing royalties (and/or other income) derived from the parties' songwriting and/or publishing activities" continue to flow.

**C. The Parties' Longstanding Course Of Conduct Establishes That They Intended Their Royalty Sharing Arrangement Under The 1977 Agreement To Continue For As Long As Publishing Revenue Derived From The Songs Subject To That Agreement Continues To Exist.**

If the nature of a contract and the circumstances surrounding its formation do not fully establish the intent of the parties, then a court may look to the parties'

pre-dispute performance under the agreement to ascertain their intent, because "a party's predispute, postcontracting conduct is powerful evidence of that party's intent and understanding of the contract at the time it entered into the agreement." *Gilkyson*, 66 Cal.App.5th at 920 (citing *Crestview Cemetery Association v. Dieden*, 54 Cal.2d 744, 753-54 (1960) ). *See also, Warner-Lambert*, 178 F.Supp. at 667 ("The courts will follow the interpretation placed upon the contract by the parties themselves as shown by their acts and conduct.").

The fact that Hodgson, Davies, and Delicate accounted to and paid Plaintiffs their contractual share of publishing and songwriting revenues pursuant to the 1977 Agreement for over 40 years – and never once during those many years asserted or even suggested to Plaintiffs that they understood the 1977 Agreement to be temporary or terminable at will – is the strongest evidence that the parties intended and understood that they would continue to share in publishing and songwriting revenues for as long as the subject *Supertramp* songs continue to generate these revenues. *See Warner-Lambert*, 178 F.Supp. at 667 ("[d]uring that entire [25-year] period the plaintiff's predecessor, with full knowledge of the facts on which it now relies, continued to make the periodic payments required by the contract without protest and without the slightest indication that it considered that its obligation had been terminated."); *Brown v. Goldstein*, 34 Cal.App.5th 41, 436-37 (2019) ("plaintiffs submitted accounting statements showing that, as recently as 2011 and

38

2013, FOM had paid plaintiffs a share of the income it derived from performance royalties. These accounting statements provide circumstantial evidence that FOM believed the 1972 Agreement entitled plaintiffs to share in performance royalties ….").

It also is quite telling that, although Hodgson testified to his purported belief *ab initio* that the 1977 Agreement was temporary and could be unilaterally terminated by himself, he never took the opportunity to do so at any time when it would have been a natural action for him to take: He did not seek to terminate the 1977 Agreement when the band members finally began to receive record royalties and tour revenues after the *Breakfast in America* tour; nor when *Supertramp* entered into its new, highly lucrative recording contract with A&M in 1981; nor when the band members negotiated in 1982, and then implemented in 1983, a different royalty split for *Famous Last Words*; nor when Margereson entered into his withdrawal agreement with the band in 1983; nor when Pope entered into his withdrawal agreement with the band in 1984; nor when Hodgson himself entered into his own withdrawal agreement with the band in 1984; nor when he issued his Letter of Direction to ASCAP in 1988 asking for direct payment of his royalties.[14]

---

[14] Hodgson variously testified that he did not address terminating the royalty sharing arrangement after the band's *Breakfast in America* tour – when money was finally coming in – because "it wasn't time to do that" (7-ER-1237:10-14); he did not terminate payments to Plaintiffs at the time of the 1984 Agreement – when all

In fact, *all* of Hodgson's actions throughout the four decades following the 1977 Agreement objectively were *directly contrary* to any purported understanding that he could unilaterally terminate the parties' royalty sharing arrangement. Rather, Hodgson's conduct from the time he signed the 1977 Agreement until 2018 – when he purported to unilaterally terminate it some 41 years later – invariably has reflected the intent of all parties that their royalty sharing arrangement will govern the publishing royalties derived from the subject *Supertramp* songs unless and until those songs cease earning such royalties.

In 1982, for example, when the financial situation had improved for the band members and Hodgson admittedly was unhappy with the existing royalty allocations under the 1977 Agreement, he negotiated a 32.15% share of the publishing royalties for *Supertramp*'s next album – leaving alone his existing 27% for the previous albums – when by terminating the 1977 Agreement, as he now claims he could have done, he would have been entitled to a 50% share of the publishing revenues from all of the albums.

In 1983 and 1984, in connection with Margerson's and Pope's withdrawal agreements, Hodgson explicitly consented to each of them continuing to receive

---

his business issues with the band were being addressed – because "it was not a priority here" (7-ER-1245:7-13); and he did not terminate the payments to Plaintiffs at the time he issued the Letter of Direction to ASCAP for direct payment of royalties because he had "more important things going on in [his] life" (7-ER-150:15-20).

their contractual share of publishing royalties under the 1977 Agreement "in perpetuity" – when by terminating that Agreement he would have been entitled to retain 50% of the publishing royalties with no continuing obligation to Margereson or Pope, let alone a perpetual one.

But perhaps the most significant example of Hodgson's contradictory post-contracting conduct occurred in 1984, when Hodgson left *Supertramp*. Hodgson's separation from the band apparently resulted from a brewing disagreement among its members: Hodgson testified that he was "forced out" of the group (7-ER-1246:1-4); Siebenberg testified that the other band members "dismissed" Hodgson (8-ER-1420:8-10). In any event, whether "forced out" or "dismissed," *if Hodgson truly believed he had the unilateral right to terminate the 1977 Agreement then that certainly would have been the obvious time to have done so*. But he did not. Rather, Hodgson merely sought and obtained the band's contractual commitment that he would "continue" to receive, "in perpetuity," 32.15% of the publishing royalties from *Famous Last Words*, and 27% of the publishing royalties from the earlier *Supertramp* albums (3-ER-375-376). Of course, if Hodgson had terminated the 1977 Agreement then he would have been entitled to his full 50% share of all publishing revenue, for all time, without the need to have anyone agree to a "perpetual" sharing arrangement or any such arrangement whatsoever. Hodgson even committed to pay over to Delicate any songwriter revenue he received

41

directly for exploitation of the *Supertramp* songs subject to the 1977 Agreement "immediately upon receipt" (3-ER-378), when he could have retained control over and kept all such revenue by terminating the 1977 Agreement.

Moreover, the provision in the 1984 Agreement creating a procedure to equalize publishing royalties between Hodgson and Davies in the event either of them purchased another participant's share (3-ER-378-379), would make no sense if the 1977 Agreement could be terminated:  Any such termination automatically would result in Davies and Hodgson each getting 50% of the publishing royalties; there would be no point in either of them purchasing another person's share of the royalties, or in acquiring half of any such purchased interest from each other – and the other parties would have nothing of value to sell if their interests in the publishing royalties could be terminated at will.

As noted above, Hodgson was separately represented by counsel in negotiating the 1984 Agreement, which took place over approximately a year; yet there was no suggestion during this entire time that Hodgson considered the 1977 Agreement – the obligations under which were detailed in the 1984 Agreement – to be terminable.  *See Warner-Lambert*, 178 F.Supp. at 667-68 (the fact that the plaintiff had, while represented by counsel, entered into a subsequent assignment recognizing and confirming its continuing obligation to make payments to the defendant, while giving no hint of its later litigation position that the original

42

agreement was terminable, constituted persuasive evidence of the parties' intent that the plaintiff's obligations were not subject to termination).

Finally, in 1988, Hodgson issued his letter of direction to ASCAP asking for direct payment of only 32.15% of the royalties applicable to the *Famous Last Words* compositions, and 27% of the royalties applicable to the other compositions – directing the remainder to Davies expressly for the purpose of sharing with Plaintiffs and the other participants – when by terminating the 1977 Agreement he could have directed ASCAP to pay 50% of *all* royalties applicable to *all* the compositions directly to him.

Certainly, therefore, the evidence establishes that Hodgson did not previously believe he had the unilateral right to terminate the 1977 Agreement and the reason for this is clear:  Any such termination would have violated the intent of all parties to the 1977 Agreement that their royalty sharing arrangement will continue so long as the *Supertramp* songs subject to that agreement continue to earn publishing royalties.  Indeed, it is difficult to imagine post-contracting conduct more contradictory to Hodgson's current litigation position.

In fact, there is nothing in the parties' performance of their contractual obligations between 1977 and 2018 – or in any of their dealings during those many years – suggesting that they intended and understood the 1977 Agreement to be unilaterally terminable by any party.  Rather, all of the parties' actions – and all of

43

their contracts – confirm their mutual intent and understanding that Plaintiffs, and all of the other parties to the 1977 Agreement as amended, would retain an ongoing and enforceable entitlement to their contractual allocation of publishing and songwriting royalties encompassed by that agreement for as long as those royalties continue to exist.[15]

This evidence of the parties' post-contract conduct constitutes conclusive proof of the parties' intent to be bound by the 1977 Agreement until such time as the referenced "song writing and publishing royalties (and/or other income) derived from the parties' songwriting and/or publishing activities" ceases to exist.[16]

---

[15] The 1977 Agreement was a 2-page document prepared as a "Memorandum of Agreement" that stated in Paragraph 1: "This Memorandum shall serve as a fully effective and binding contract unless and until such time as a formal agreement covering the same subjects is entered into." Although the 1977 Agreement included a start date for the parties' royalty allocations – *i.e.*, "effective January 1, 1977" – it did not have an end date. Notably, however, *every* subsequent contract made between these parties on this subject was far more detailed and included "in perpetuity" language with respect to allocation of publishing royalties – clearly evidencing the parties' unanimous intent and understanding from the outset that none of these agreements could be unilaterally terminated.

[16] We believe the purpose and nature of the 1977 Agreement *alone* establish its implied duration even without considering the parties' post-contract conduct. *See Warner-Lambert*, 178 F.Supp. at 667. But evidence of this decades-long conduct renders the inevitable conclusion – that the implied duration of the 1977 Agreement was for as long as the subject *Supertramp* songs continue to generate publishing revenue – overwhelming.

### D. **Conclusion**

The application of clear, longstanding California principles of contract interpretation demonstrate, as a matter of law, that Hodgson and Delicate have a continuing obligation to share songwriting and publishing revenues with Plaintiffs in accordance with the percentage allocations set forth in the 1977 Agreement as amended, and that the District Court erred in ruling that the agreement was subject to unilateral termination after a "reasonable time." Accordingly, Plaintiffs respectfully request that this Court reverse the judgment below, and remand the matter to the District Court with instructions to enter judgment in favor of Plaintiffs on the issue of liability, and proceed to determination of the damages due to them.

Respectfully submitted,

Dated: August 23, 2024

Mandavia Ephraim & Burg LLP

By: ___/s/ *David L. Burg*_____
Attorneys for Plaintiffs / Appellants

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, I certify that the attached Appellants' Brief is proportionately spaced in 14-point Times New Roman typeface and contains 9302 words (as calculated by Microsoft Word 2010), excluding the Table of Contents and Table of Authorities, and this Certificate of Compliance.

Respectfully submitted,

Dated:  August 23, 2024          Mandavia Ephraim & Burg LLP

By:  _/s/ *David L. Burg*_____
Attorneys for Plaintiffs/Appellants